## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff,<br><br>    v.<br><br>LONG ISLAND UNIVERSITY, JEAN ANNE SMITH, NICOLE THOMAS and BRYAN COLLINS,<br><br>        Defendants. | Civil Action No. 1:20-cv-4256<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff John Doe[1] ("Plaintiff" or "John" or "Doe"), by his attorneys Aidala, Bertuna & Kamins PC as and for his Complaint against Defendants, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the damaging actions taken and inadequate procedures employed by Defendants Long Island University ("LIU"), Jean Anne Smith ("Smith"), Nicole Thomas ("Thomas") and Bryan Collins ("Collins") (collectively, "Defendants") in the course of their gender-biased investigation and erroneous adjudication of a Complaint of sexual misconduct ("Complaint") filed by Jane Roe[2] ("Roe") against John Doe to the faculty and/or administration of LIU, and adjudicated by the faculty and/or administration at LIU.

2.      Roe's Complaint alleging that she was forcibly sexually assaulted by Doe arises out of a consensual kiss that occurred between Roe and Doe on the evening of September 2,

---

[1] Plaintiff has filed herewith a motion to proceed pseudonymously as "John Doe."

[2] Roe is referred to herein pseudonymously.

2017, in a dormitory room on LIU's campus, with witnesses present at the time. Roe herself had initiated the kiss. Roe is a Caucasian female, and Doe is an African-American male.

3.      Roe had been drinking that evening, unlike Doe, who then played football for LIU and had resolved not to drink during the football season to maximize his performance. In the hours that elapsed after Roe had initiated their encounter by offering Doe drinks he declined and then kissing Doe in front of many witnesses, an increasingly-intoxicated Roe became upset while expressing concerns that the public kiss could threaten a committed relationship she was in at the time with another man. Doe had long since left that dormitory for a separate dormitory building.

4.       The following day, on Sunday, September 3, 2017 at approximately 5pm, Roe reported her Complaint to LIU, alleging, *inter alia*, that, while she and Doe were in the dorm room the previous evening, Doe had forcibly made her give him non-consensual oral sex and then forcibly "pulled" her into a separate room where he laid on top of her and kissed her without her consent. Neither Roe nor Defendants ever reported these serious allegations to a law enforcement agency.

5.      The arc by which Roe managed to arrive at the fabricated allegations of forcible oral sex that she ultimately made against Doe in her Complaint has never been made clear. Defendants' deficient and hasty investigation into the Complaint produced a convoluted web of inconsistent and contradictory accounts from witnesses as to what Roe was initially telling people in the dormitory about what transpired between her and Doe. What was ultimately made clear from the witnesses Defendants interviewed, however, was that: (a) none of them saw any sexual activity between Doe and Roe beyond kissing; (b) the room where the kissing – and Roe's alleged sexual assault – took place was well-lit, full of witnesses, and had its door open; (c) Doe and Roe were at no point alone in the room; and (d) the group of students in the room at the time

of the alleged sexual assault ultimately left the room together, including Doe and Roe. Similarly, no witness said they saw Doe "pull" Roe out of the room.

6.      Also made clear in Defendants' investigation was that, for her part, Roe gave three separate versions of events throughout the course of the investigation and adjudication of her Complaint that all shared common central factual elements that were flatly contradicted by key witnesses. For one, in all three versions Roe gave, the alleged assault by Doe ended in her room, which she claimed Doe had "pulled" or "yanked" her into (after forcing her to give him oral sex in front of multiple people), when her roommate physically pulled Doe off of her. Both Roe's roommate and another student present in Roe's room at the time flatly <u>denied</u> in LIU's investigatory interviews that the roommate or anyone else ever pulled Doe off Roe.  Similarly, in all three accounts offered by Roe, Doe allegedly forcibly "pulled" or "yanked" her to her room, which was on a lower level of the building than the room in which she claimed she had been forcibly orally sodomized by Doe in front of witnesses prior to being "pulled" by Doe to her room. Two of Roe's friends were in the dormitory hallway at the time Roe and Doe had left the first higher-floor dorm room they had been seen kissing in, and reported to LIU in investigatory interviews that they observed Roe and Doe walking down the hallway at the time with physical distance between the two, in a one-behind-the-other formation.

7.      Beyond that two key factual elements permeating all three versions of Roe's narrative were clearly contradicted by witness accounts, Roe, in her third and final version of her story, added a provably and objectively false new factual element: she claimed that the room where she alleged Doe had forced her to give him oral sex in the presence of witnesses was set up with two dressers in the middle of the room that functioned as a "wall." This added factual assertion was flatly untrue; as has been confirmed by the student whose room it was, and who

was also present for the entire duration of Roe and Doe's interaction in his room the evening of September 2, 2017, as the room had no dressers in the middle, and none of the furniture in the room was configured in a way such as to constitute a "wall." Defendants had reason to know this was the case, given that LIU oversees and manages that dormitory room located on its premises.

8.      Despite the obvious contradictions and inconsistencies between key factual assertions made by Roe and the accounts of witnesses interviewed by Defendants for the investigation of the Complaint, Defendants ultimately determined that her allegations were credible and thus warranted severe sanctions against Doe. Defendants reached this determination, and thus concluded their investigation, on September 14, 2017, just ten (10) days after the investigation had been initiated on September 4, 2017.

9.      Pursuant to Defendants' determination that Roe's allegations were credible, despite the flawed and deficient investigation and procedure, and glaring factual inconsistencies that did not corroborate Roe's story, Defendant sanctioned Doe per their Notice of Determination and Sanctions dated September 14, 2017 as follows: (a) Doe would be suspended from LIU for a full academic year, until May 15, 2018; (b) Doe would be restricted from entering LIU's campus grounds for any reason until May, 2018; and (c) Doe was ordered to have no contact (physical, written, verbal or electronic) with Roe until May, 2018. The finding of guilt against Doe for sexual misconduct would also be noted on his academic transcript. Before receiving Defendants' September 14, 2017 formal Notice of Determination and Sanctions, Doe had not yet even been made aware that Defendants' investigation had reached a phase where sanctions were being considered.

10.     Bizarrely, per Defendants' Notice of Determination and Sanctions, despite that Defendants purported to have found Roe's very serious allegations of forcible sexual assault to

have been credible, Defendants invited Doe to reapply for re-admittance to LIU for the following fall 2018 semester and noted that his No Contact order with Roe would not be in effect past May 2018.

11.     As he was entitled to do, per LIU's Student Bill of Rights, Doe appealed Defendants' determination and sanctions against him on October, 27, 2017 ("Determination Appeal"), arguing, *inter alia*: (a) that Smith and Thomas, as LIU's Title IX coordinators who undertook the investigation into Roe's Complaint, had conducted their investigation in abrogation of multiple explicit procedural safeguards afforded to Doe pursuant to LIU's Student Bill of Rights, Title IX, and Article 129B of the New York Education Law; and (b) that the ultimate determination and sanctions were inappropriate based on the readily available evidence; and (c) that the sanctions, resulting from an inappropriate and hasty determination based on flimsy evidence, were arbitrary and excessive under the circumstances. This appeal was summarily rejected in full, with no explanation provided as to the rationale behind the rejection.

12.     Despite the foregoing, Doe went through the process of reapplying and had been readmitted to LIU for the fall 2018 semester. He did so on the basis of his understanding that he would return to LIU still on a full scholarship and able to engage in the athletics for which he had been awarded that scholarship. However, on or about March, 2018, he was suddenly made aware via text message from LIU's football head coach, Defendant Collins, for whom Doe had played during his freshman year and the beginning of his sophomore year at LIU, that Defendants had determined that, because Defendants had found Roe's Complaint credible, Doe would be permanently kicked off LIU's football and track teams and would thus no longer receive the full-ride athletic scholarship that had attracted and enabled Doe to attend LIU in the

first place. Doe had thus been effectively expelled from LIU by Defendants; Defendants never provided him any notice of this fact before this text message from Collins.

13.     Throughout the investigation and adjudication of Roe's complaint, Defendants engaged in substantial errors in violation of Federal law, State law and the LIU's own policies. A non-exhaustive list of Defendants' wrongful actions includes the following: (i) Defendants never formally provided Doe with an advisor or information regarding his right to choose an advisor in connection with the Title IX investigation pending against him; (ii) Defendant Smith, as LIU's head Title IX coordinator, repeatedly represented herself to Doe and his parents as his advocate while simultaneously counseling and representing herself as an advocate to his accuser Roe; (iii) Defendant Smith, while simultaneously holding herself out to both the accused and the accuser in the matter as their respective advocate, was also one of the two investigators for the matter and made the ultimate determination as to Doe's culpability and the sanctions levied against him; (iv) Defendants Smith and Thomas, as the two who undertook the Title IX investigation, conducted cursory and brief interviews of thirty (30) minutes or less with some of the witnesses and ignored key inconsistencies and contradictions unearthed by the witness interviews; (v) Defendants did not give Doe an opportunity to cross-examine any witness and did not advise him of his right to present witnesses on his behalf; (vi) Defendants did not advise Doe of his right to provide an impact statement during the sanctions phase of their investigations; (vii) Defendants did not advise Doe when their investigation had reached a sanctions phase; (viii) Defendants evidenced a gender bias against Doe as the male accused of sexual misconduct throughout the investigative process, and Doe also feels he was discriminated on the basis of his race, due to his being a Black male and Roe being a White female; (ix) Defendants, with no ascertainable evidentiary basis, gave more weight to Roe's assertions of non-consensual sexual contact initiated against

her by Doe than the weight they accorded Doe's assertion that Roe, in fact, unilaterally initiated sexual contact with him by kissing him; (x) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (xi) Defendants failed to afford Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (xii) Defendants deprived Doe of the opportunity to confront and question his accuser, and ultimately deprived him of the ability even to hear her testimony and evaluate whether the procedure was fair and complied with the University's policies; and (xiii) Defendants failed to ever formally notify Doe of their determination that their Title IX investigative findings warranted the extraordinary sanctions of permanently kicking Doe off LIU's football and track teams and permanently stripping him of his full-ride athletic scholarship to LIU.

14.     Accordingly, Doe brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972, violation of Title VI of the Civil Rights Act of 1964, violation of New York State Constitution Procedural Due Process, breach of contract, and promissory estoppel.

## THE PARTIES

15.     Doe is a natural person and current resident of the State of North Carolina. At all times relevant herein, John Doe was either a student in good standing at Defendant LIU residing on Defendant LIU's campus, or a suspended student at LIU residing off-campus during his suspension.

16.     Defendant LIU, located in Brookville, New York, is a private university.

17.     Upon information and belief, Jean Anne Smith ("Defendant Smith") is a resident of the State of New York and was the Associate Dean of Students and Title IX Coordinator employed by LIU.

18.     Upon information and belief, Nicole Thomas ("Defendant Thomas") is a resident of the State of New York and was a Title IX Investigator employed by LIU.

19.     Upon information and belief, Bryan Collins ("Defendant Collins") is a resident of the State of New York and was employed by LIU as the head coach of their Division II Football program at all relevant times herein.

## JURISDICTION AND VENUE

20.     This Court had jurisdiction over federal law claims and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims that form the same case or controversy under Article III of the United States Constitution.

21.     This Court has personal jurisdiction over Defendant LIU on the ground that it is conducting business within the State of New York and the Eastern District of New York.

22.     This Court has personal jurisdiction over Defendant Smith on the grounds that she was an employee of Defendant LIU at all relevant times herein and personally acted within the State of New York and the Eastern District of New York.

23.     This Court has personal jurisdiction over Defendant Thomas on the grounds that she was an employee of Defendant LIU at all relevant times herein and personally acted within the State of New York and the Eastern District of New York.

24.     This Court has personal jurisdiction over Defendant Collins on the grounds that he was an employee of Defendant LIU at all relevant times herein and personally acted within the State of New York and the Eastern District of New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.      Defendant LIU's Policies and Contract with John Doe.**

25.     Doe grew up in New Jersey and lived there with his family up until he moved to Brookville, New York in the fall of 2016 to study at LIU on a full athletic scholarship and join LIU's Division II Football program and track team. Doe is a young Black man.

26.     Doe excelled academically and was a well-liked standout athlete playing on the school's football, track, and basketball teams. To that end, Doe was the recipient of numerous awards that recognized him not only for his athletic excellence, but also for the moral and ethical integrity he exhibited off the athletic field or court. One such award he received in his senior year of high school was a schoolwide award that recognizes those students exhibiting an exceptional "positive attitude, dedication, and acts of kindness towards others." In addition to being an esteemed athlete and member of his school's student body, as a man of faith, Doe has always been (and continues to be) an active and well-respected member of his church.

27.     Prior to Roe, a young White woman, reporting her false allegations of sexual assault by Doe to LIU in September, 2017, Doe, who is the son of a law enforcement officer  (a detective) and the loving brother of four sisters, never had any disciplinary issues at LIU, nor at any other educational institution he ever attended, and never had any negative contact with law enforcement.

28.     Upon his acceptance to LIU, Doe was provided access to copies of LIU's school policies, which included, among other documents, LIU's Sexual Violence and Harassment Policy ("SVHP") and the Students' Bill of Rights included therein. It was Doe's understanding that both he and LIU as an institution were required to follow the provisions of the SVHP.

29.     The policies set forth in the SVHP, and in its accompanying Students' Bill of Rights, set forth the rights of and procedures available to LIU students who believe they have been a victim of sexual violence and/or harassment. The policies further set forth the procedures by which LIU students who have been accused of violating LIU's policies enumerated in the SVHP are investigated, heard, and, possibly, disciplined.

30.     Upon matriculating as a freshman at LIU, it was made clear to Doe during his orientation process that compliance with the provisions of the school's SVHP was binding upon the students and the institution.

31.     The relationship between Doe and Defendant LIU was governed by the Student Code of Conduct ("Code of Conduct") for the 2017-2018 Academic Year, which explicitly incorporated the SVHP and reiterated the fact that the SVHP covered all members of the LIU community, including students, faculty, and staff.

32.     The Code of Conduct constitutes a contract between students and LIU and, in particular, between Doe and Defendant LIU.

33.     A copy of the Code of Conduct is provided to and readily available online to each member of the LIU community.

34.     The SVHP, which is explicitly incorporated into the LIU Code of Conduct binding on LIU's whole community, prohibits, *inter alia*, sexual harassment, domestic violence, relationship violence, sexual assault, and stalking.

35.     Though the SVHP purports to cover "all" members of the LIU community, the Students' Bill of Rights incorporated into the SVHP is, by its plain language, biased in favor of those who *report* sexual misconduct in violation of the SVHP. Indeed, shockingly, just before the specific rights purportedly afforded to "all" students under the Students' Bill of Rights are listed, Defendants' Students' Bill of Rights document reads as follows:

"All **reporting** individuals of these crimes and violations, regardless of race, color, national origin, religion, creed, age, disability, sex, gender identity or expression, sexual orientation, familial status, pregnancy, predisposing genetic characteristics, military status, domestic violence victim status, or criminal conviction, have the following rights, regardless of whether the crime or violation occurs on campus, off campus, or while studying abroad." (bold added for emphasis)

36.    Defendants' Students' Bill of Rights thus, by this overt language, does not even on its face purport to afford any of the procedural rights delineated therein to those accused of SVHP violations; only to those who report SVHP violations. Nonetheless, despite this explicit display of institutional prejudice in departure from established federal and state law, Defendants SVHP maintains that its scope extends to "all members of the community."

37.    In practice, because it is informed by a clearly-stated bias in favor of only those who report SVHP violations, Defendants' SVHP substantially limits an accused student's ("Respondent") rights during the disciplinary process, notwithstanding the oftentimes very serious nature of the charges considered under this Policy - namely, sexual misconduct, including sexual assault and rape.

38.    The SVHP, and its attendant Students' Bill of Rights, do, however, provide LIU students with several important rights, none of which Doe was ultimately afforded in the instant matter:

a)  the right be accompanied by an advisor of choice who may assist and advise a reporting individual, accused, or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process". (*Students' Bill of Rights*, ¶ 10);

b)  the "right to make an impact statement during the point of the proceeding where the decision maker is deliberating on appropriate sanctions." (*SVHP* pp. 9-10)

c) the right of each party to a prompt, thorough and impartial investigation of the complaint by Defendants;

d) the right of each party to "an equal opportunity to be heard and to present relevant witnesses and evidence during the investigation process" (*Students' Bill of Rights* ¶ 4); and

e) the right of the accused to be considered innocent of the allegations unless proven responsible according to a preponderance of evidence standard. (*SVHP* pp. 10)

**B.    New York State Education Law Article 129-B and Due Process.**

39.    On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* NY Educ. L. § 6438 *et seq*. (2015).

40.    Art. 129-B was passed, *inter alia*, to provide an allegedly fair and consistent administrative process to students in higher education accused of sexual assault, domestic violence, dating violence or stalking.

41.    Art. 129-B applies to all public and private institutions of higher education in the State of New York. It mandates that all such institutions adopt certain rules and procedures in connection with their sexual misconduct policies.

42.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.

43.    Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

44. Art. 129-B specifies that its provisions apply regardless of whether an alleged violation occurs on campus, off campus, or abroad.

45. Art. 129-B mandates that all New York State institutions of higher education implement, among other things:

- a specific, State-affirmed definition of affirmative consent to sexual activity;

- a specific, State-affirmed policy for alcohol and/or drug use amnesty;

- a specific, State-affirmed student bill of rights; and

- a specific, State-affirmed response to reports of alleged misconduct.

46. Art. 129-B provides students accused of sexual assault, domestic violence, dating violence, and stalking. Art. 129-B also mandates that the accused has a right to "a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely and thorough manner by individuals who receive annual training in conducting investigations of sexual violence … including the right to a presumption that the respondent is 'not responsible.'" NY Educ. L. § 6444(5)(c)(ii).

47. Art. 129-B further requires an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest." NY Educ. L. § 6444(5)(c)(iii).

48. Finally, Art. 129-B gives all students the right "to review and present available evidence in the case file, or otherwise in the possession or control of the institution, and relevant to the conduct case[.]" NY Educ. L. § 6444(5)(c)(iv).

49. Nevertheless, by its express terms, Art. 129-B inherently affords greater rights to reporting individuals than accused individuals.

50.     As one example of this inherent bias, the mandatory student bill of rights requires that a reporting individual "[b]e free from any suggestion that [she] is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations." NY Educ. L. § 6443.

51.     Not only does this presuppose the existence of a "crime or violation," it omits any concurrent right of the accused to be free from the suggestion that he is at fault, or should have acted in a different manner. In this respect, the language in Art. 129-B is quite similar to that contained in Defendants' Students' Bill of Rights; both evince a surface-level refusal to recognize uniform rights for the accuser and the accused.

52.     The statute also requires institutions to provide multiple forms of assistance to reporting individuals, including assistance obtaining an order of protection against the accused (a civil proceeding which takes place in the courts of New York State).

53.     Moreover, the statute forces institutions to make a notation on the transcript of students found responsible after a conduct process, *see* NY Educ. L. § 6443(6), thus forever affecting their reputation and good name.

54.      On information and belief, LIU has adopted policies and procedures as mandated by the State of New York and has, consistent with the adoption of those policies and procedures, acted under the color of state law in connection with all sexual misconduct disciplinary proceedings carried out by the University since Art. 129-B went into effect, including the disciplinary proceeding in the instant case.

**C.     The "Incident" On The Night of September 2, 2017**

55.     On the evening of September 2, 2017, at some point approximately between 7pm and 8pm, Doe and his roommate walked from their dorm room in Post Hall ("Post") on LIU's

Campus to a party they had been told about taking place in a co-educational dormitory building named Brookville Hall ("Brookville ") that is also on LIU's campus.

56.     The party in Brookville began at some point approximately between 8pm and 8:30pm in a dorm room on the third floor of Brookville and also spilled out into the hallway outside of the dorm room. Doe observed approximately 70-80 students in attendance who were drinking and playing drinking games such as beer pong. Doe, hoping to excel in his sophomore year playing football for LIU (which had just begun at that point), did not drink because he had resolved not to during the football season.

57.     At some point not long after Doe had arrived at the party, a female student who Doe did not know at the time, but later learned was Roe, offered Doe a drink, which he declined. Soon thereafter, Residential Assistants ("RA's") overseeing Brookville cleared the party because, they said, it had become too loud, and the party's attendees dispersed.

58.     Doe moved along with two friends who had been in attendance to one of the friend's dorm rooms located on the same floor as the room where they party had just been broken up. When Doe and his two friends arrived in that dorm room, Roe was already in the room. Doe sat at the edge of a bed in the room, whereupon Roe sat next to him on the other side of the same edge of the same bed. Doe still did not know Roe's name at that point, and did not learn it until the following evening, when he was advised that she had falsely reported him for a forcible sexual assault that never occurred.

59.     At some point soon thereafter, a female student who Doe was friendly with, and who was among a group of students also sitting and chatting in the well-lit room with Doe and Roe, inquired with Doe as to how he and his then-girlfriend's relationship was doing. When Doe responded that he and his girlfriend were, in sum and substance, not broken up but giving one another space, Roe once again asked Doe if he wanted some of her Mike's Hard Iced Tea. Doe

once again declined Roe's offer for a drink, explaining that he was not drinking. Roe then unexpectedly kissed Doe.

60.     The kiss Roe initiated lasted a few seconds before Doe pulled back because his girlfriend's roommate was in close proximity, standing at the open door to the dorm room the kiss was taking place in. Doe remained for another uneventful hour in this dorm room surrounded by his acquaintances before eventually leaving for a different dormitory building named Kings Hall ("Kings") on LIU's campus.

61.     Before leaving Brookville, Doe stopped to talk to his girlfriend, who was located on the floor below. On his way to finally exit Brookville , he saw the Captain of his Football team in a room with the door wide open, entered the open room to chat briefly with him, and noticed that Roe was also in the room and appeared dramatically more intoxicated than when she had earlier kissed Doe after repeatedly asking him if he wanted a drink. Doe then observed Roe and another visibly intoxicated female student begin kissing one another, at which point the team Captain attempted to put his head in between Roe and the other female student as they kissed. Doe did not remain and then left for Kings.

62.     At some point at or about 10pm, Doe was at Kings and received a phone call from a teammate indicating that a female student back at Brookville was telling people that Doe had forced himself on her. The teammate told Doe to come back to Brookville. Doe did so at once.

63.     When Doe arrived at Brookville, he observed a group of his more senior-status football teammates waiting to confront him. All but one of them were visibly intoxicated and immediately began screaming at him and invading his physical space. This sober teammate (who was the only other Black team member other than Doe present) was attempting to get the other teammates to calm down and move out of Doe's personal space.

64.     After the run-in with his very drunk and aggressive teammates, Doe, still unaware of what he was being alleged to have done, went upstairs in Brookville to attempt to find out which female student had accused him of misconduct, and what specific misconduct he was being accused of. He got no answers from the various students he recognized from the earlier party; instead, conversely, most of the people Doe attempted to question in Brookville asked Doe what happened. Nobody appeared to know anything. Nobody offered any details. While in Brookville, Doe observed Roe standing in the hallway talking to two male students and overheard her say the phrase in sum and substance: "Nothing happened."  Having failed to obtain any information about what he was being accused of, Doe returned to his dorm room in Post.

**D.     Jane Roe's University Complaint and The Investigation.**

65.     The following day, on Sunday, September 3, 2017, Doe went to morning football practice, where his teammates who had been so drunk and aggressive with him the previous night apologized to him. The rest of that day proceeded without incident until Doe was summoned around 10pm to Post's RA office. When he arrived at the RA office, there were five LIU Public Safety officers already there, and they informed him that he had been formally accused of sexual assault. The Public Safety personnel further informed him that he was to vacate campus immediately, and they escorted him off campus.

66.     Doe, with nowhere to go at that point, was fortunate that a teammate's family allowed him to stay the night in their home. The following day, on Monday, September 4, 2017, Doe called his father, who later came to pick him up at LIU. On that same date, Doe received a formal Notice of Investigation from Defendant Smith, LIU's Title IX Coordinator, advising Doe that he was suspended from the LIU campus until further notice pending the outcome of a Title IX investigation that was now open against him. Doe later learned that the Title IX investigation arose from wholly untrue allegations that Roe had formally reported at or around 5pm the

previous day (September 3, 2017) that, *to wit*, on the night of September 2, 2017 Doe had forcibly made her give him oral sex in the room full of people where Roe had kissed him, and she further fabricated that Doe subsequently "dragged" her into her room downstairs, laid on top of her forcibly kissing her, and that this alleged assault in her room did not stop until Roe's female roommate physically pulled Doe off of her.

67. Roe was not told the substance of Roe's allegations at the outset of the investigation. The Notice of Investigation he was provided merely listed the incorrect date of September 3, 2017 as the alleged incident occurrence date, vaguely stated that the incident allegedly happened in Brookville without saying where in Brookville, contained no time of day for the alleged incident, and did not include a single factual allegation or description of the alleged incident. Further, the Notice of Investigation did not set forth a single specific conduct violation being investigated. In this respect, the Notice of Investigation did not meet the notice requirements of Art. 129-B from the outset.

68. On or about September 4, 2017, when Doe first received the Notice of Investigation, Defendant Smith represented in a phone call with Doe that she was going to be his advocate for the purposes of Title IX investigation. She further stated that Doe could reach her through phone or email any time he needed her to that end. She echoed these statements in a meeting on September 5, 2017 with Doe and his father, where Defendant Thomas was also present. Defendant Thomas, LIU's Title IX Investigator, was at that meeting to begin questioning Doe about the incident. She proceeded to do so, with the approval of Defendant Smith masquerading as Doe's "advocate," before Doe had yet ever been advised of any single one of the specific factual allegations against him that Defendants Smith and Thomas were actively at that point investigating.

69. Beyond failing to give Doe notice of the allegations against him before subjecting him to questioning, at no time did Defendant Smith or any other representative of LIU explain to Doe that he had a right to pick his own advisor. Similarly, at no point did Defendant Smith or any other LIU representatives advise Doe of the significance of an advisor in the context of a Title IX investigation.

70. Neither Defendants Smith or Thomas, nor any other LIU representative, ever advised Doe of his right to present witnesses on his behalf, the burden of proof applicable to the investigation. Without doing so, Defendant Thomas nonetheless engaged in her September 5, 2017 questioning of Doe.

71. Beyond impermissibly questioning Doe before ever giving him legally-required notice of the specific factual allegations and code violations he was up against, Smith failed to ever disclose that she had also represented to Roe that she was acting as Roe's advocate in the investigation. Smith was thus sitting in on Doe's premature and unlawful questioning by Thomas on September 5, 2017, surreptitiously assuming conflicting simultaneous roles as: (a) LIU's Title IX Coordinator actively participating with Title IX Investigator Thomas in a Title IX investigatory interview; (b) Doe's personal advocate in the investigation that Smith herself was currently conducting; (c) Roe's personal advocate in the investigation that Smith was currently conducting; and (d) as the Title IX Coordinator, per LIU's SVHP, she was also aware she would be the sole party responsible for issuing an ultimate determination on Roe's Title IX Complaint. Accordingly, Defendant Smith was sitting there effectively as the investigator, the advocate representing the two adverse parties with irreconcilable interests, the jury, and the judge for the purposes of this Title IX Complaint.

72. On information and belief, Defendants Smith and Thomas were aware that: (a) they were impermissibly participating in an interview of a Title IX respondent who had no idea

what he was being accused of yet; and (b) that Defendant Smith was assuming four impermissibly conflicting roles in the investigation that violated State law, as incorporated into LIU's Code of Conduct, requiring her as LIU's Title IX coordinator to provide Doe an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest." NY Educ. L. § 6444(5)(c)(iii).

73.    After the September 5, 2017 unlawful interview of Doe before he had even received notice of the allegations against him, Defendants Smith and Thomas went on to further violate state law, federal law, and LIU's SVHP by never notifying Doe of his right to present relevant witnesses and evidence on behalf during the investigation or his right to provide an impact statement at the sanctions phase of the Title IX investigative process. In fact, Doe never was even provided any notice that Defendants were at a point in the investigative process where sanctions were being deliberated. To the contrary, as late as the evening of September 11, 207, Defendant Smith represented to Doe's mother on the phone that Defendant Smith was going to "represent" Doe in "the best light possible" so that Doe "can get back to school." Beyond being deprived of his right to present exculpatory evidence, neither Doe nor any representative of his were given possession of any of the evidence gathered against him at any point during the investigation or cross-examine any witness.

74.    On September 14, 2017, after Defendants Smith and Thomas had spent a mere ten (10) days conducting a hasty and unlawful Title IX investigation in which Smith had unethically functioned as investigator and advisor to the two adverse parties, fact-finder, and judge, Doe was given formal notice that Smith had concluded that Roe's allegations were credible and warranted a one-year suspension of Doe, during which he could not return to LIU or have any contact with Roe. This Notice of Determination and Sanctions included no description of the evidence it

relied on, nor the rationale underpinning the determination. Doe had, at that point, still not been given possession of any of the evidence produced against him, and was still unaware of the unlawful and unethical conduct Defendants Smith and Thomas had engaged in during the course of their investigation. Doe was blindsided by this Notice of Determination and Sanctions; he had not even been made aware at any point that the investigation had reached a point where sanctions were being considered.

75.     The same week that Roe falsely alleged her sexual assault by Doe occurred, one of Doe's White teammates physically assaulted his (the White teammate's) girlfriend. Defendants were aware of this assault, and the assault constituted a violation of their SVHP. Upon information and belief, Defendants did not subject that White teammate to disciplinary measures similar to those they imposed upon Doe. Instead, they held a meeting with their athletic teams about sexual assault.

76.     After multiple unanswered requests from Doe to finally be provided the findings of facts and rationale forming the basis for the determination against him for the purposes of an appeal, Doe finally received a one-paragraph response letter on October 19th, 2017 describing Defendant Smith's and Thomas' findings.  That letter vaguely and incorrectly stated, in sum and substance, that Smith and Thomas had determined that Roe's allegations had been corroborated "by other evidence in important respects" and that Doe's "account of relevant events was inconsistent" with other evidence and was not credible.

77.     As previously set forth, Roe's central claim was that Doe had managed to forcibly force her to perform oral sex in a well-lit room in the presence of many people, with the room door open, and that the room contained a "wall" in the middle of it formed by dressers. Not a single witness Smith and Thomas interviewed ever corroborated seeing Roe and Doe engaged in any sexual activity beyond kissing, and the room objectively did not have dressers in the middle

of it forming a wall. The room was well-lit and there were no "walls" obscuring any line of sight; nobody present in that room saw the alleged forcible oral sex occurring a few feet away from them because it did not happen.

78.     Roe's second central claim, which Smith and Thomas falsely claim had been corroborated in their investigation, was that, after the alleged forcible oral sex in a room full of people, Doe dragged Roe downstairs to her room and forced himself on top of her and that she had to ask her roommate to pull him off. Smith and Thomas interviewed Roe's own friends who had been in the hallway down which Roe alleged Doe had dragged her to her room; those friends conclusively told Smith and Thomas that Roe and Doe were walking down that hallway one-behind-the-other and that Roe was not begin dragged. Similarly, Smith and Thomas interviewed Roe's roommate who allegedly had to pull Doe off Roe; the roommate and another student who were present at the time said this never happened.

79.     Accordingly, not one single eyewitness corroborated either the alleged occurrence of the very public forcible oral sodomy or the alleged subsequent alleged occurrence of the very public dragging of Roe through the halls and stairwells of a packed dormitory building full of students having a party. Roe's claims remain completely unsubstantiated to this day. This decision was obviously contrary to the preponderance of evidence standard and demonstrated a dramatic bias in favor of the female accuser, even when that accuser's claims constituted facially-implausible allegations that she had been subjected to two separate and consecutive instances of public sexual assault in front of dozens of peers and somehow none of those witnesses saw any of it happen.

80.     As the obvious unfairness and unlawfulness of Smith and Thomas' deficient ten-day investigation had come to light, Doe filed his appeal on October 27, 2017. That appeal was denied, and the determination in that regard by LIU also came without any explanation of its

rationale. In doing so, LIU doubled-down on their choice to railroad a young Black man with no history of misconduct on a full scholarship to their institution. They did so because, per Smith and Thomas, they found a young White woman's claims that he brazenly sexually assaulted her twice in front of countless witnesses in the middle of a large party more compelling than Doe's denials of same and the lack of any evidence beyond her own assertions. They also therein reaffirmed their choice to impose severe sanctions upon Doe of a degree and nature that they chose not to institute against his similarly-situated White teammate who had been abused of physically assaulting his girlfriend the same week Roe reported Doe.

81.     Defendants' decision to arbitrarily credit the false accusations by Roe (despite her ultimate inability to prove them whatsoever), but not to equally credit Doe's denials of those accusations, evinces strong gender, and racial, bias in their decision-making. Roe had the burden of proof; Doe was to presumed innocent of her accusation unless proven otherwise. Yet, when she could not prove her accusations, the mere fact that she made those allegations was enough to warrant suspending Doe for a whole year, permanently notating a sexual misconduct finding on his official transcript, and, at some undetermined point, stripping him permanently of his ability to engage in the athletics endeavors for which he had received a full scholarship to LIU without ever providing him formal notice of that decision.

82.     Doe has been irreparably harmed by Defendants' unlawful and arbitrary actions.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972 - Erroneous Outcome**

83.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

84.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

85.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant LIU.

86.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

87.     An "erroneous outcome" occurred in this case. John Doe was innocent and wrongly found to have committed a violation of LIU's Policies, and, per the facts surrounding Defendants' mishandling of the investigation that eventually came to light in thereafter, gender bias was a motivating factor.

88.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

89.     The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[4]

90. Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of the Roe complaint.

91. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon John Doe. These circumstances include, without limitation:

    a) Defendants, through Smith and Thomas, accepting Jane Roe's allegations of sexual misconduct at face value, despite having failed to corroborate those allegations, and over Doe's denials of the allegations;

    b) Defendants, through Smith and Thomas, accepted, without question, major changes to Roe's story, including that, in the third and final iteration of her story, Roe suddenly was claiming there had been some kind of non-existent "wall" of dressers in the middle of the room where she claims the initial assault happened in the presence of many people;

    c) Defendants, through Smith and Thomas, accepted Roe's allegations as true despite that her initial version of events on the night of the actual alleged incident was that Doe simply kissed her;

---

[4] *Id.* at 20.

d)  Defendants, through Smith and Thomas, disregarded fatal inconsistencies in Roe's statements to avoid finding her less credible, such as Roe's roommate flatly denying that she ever pulled Doe off Roe, and Roe's two friends conclusively stating that Doe did not drag Roe into her room because he was not even touching her as they walked down the hallway;

e)  Defendants, through Smith and Thomas, disregarding accounts that Roe had ended the night of September 2, 2017 so intoxicated that she could not remember who she had been kissing, in contrast to Doe's uncontroverted account that he did not consume alcohol at all that night;

f)  Defendants, through Smith and Thomas, demonstrated a presumption of guilt against John Doe by vaguely stating, without providing examples, in their October 19, 2017 letter to him that his account of the relevant events was not credible, in contrast with their finding Roe's disproven accounts of event somehow credible. In so doing, Defendants showed extraordinary gender, and racial, bias, since they inexplicably continued to credit Roe even after finding two of her central allegations against Doe were denied by witnesses who were her own friends and her own roommate and whom Doe had no association with. The only possible explanation for these skewed credibility assessments is gender bias, and implicit racial bias.

92.  Further, upon information and belief, Defendant LIU possesses communications evincing Defendants' predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

93.     Upon information and belief, Defendant LIU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

93.     Based on the foregoing, Doe was subjected to a biased, prejudicial and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

94.     As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

95.     As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
## Violation of Title VI of the Civil Rights Act of 1964 – Racial Discrimination

96.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

97.     Doe is African-American and is a member of a protected class.

98.     Doe had an excellent academic and athletic record before arriving at LIU and qualified to continue his education at LIU.

99.     Doe, as a African-American man, was deprived of his ability to exercise his rights under LIU's Code of Conduct and SVHP, while Roe, a Caucasian woman, was able to exercise her rights under LIU's Code of Conduct and SVHP.

100.    Doe and Roe were similarly situated in that Roe reported to LIU that Doe initiated sexual contact with her without her affirmative consent, while Doe relayed that Roe, in fact, had

been the party who initiated unsolicited sexual contact against him without his affirmative consent. Both of the parties' accusations against one another in this regard, if equally credited, would have constituted allegations of violations of LIU's SVHP and Code of Conduct.

101.    Despite that Roe's allegations of nonconsensual sexual contact by Doe turned on key factual assertions by Roe that were flatly debunked by eyewitnesses interviewed by Defendants, and notwithstanding that Doe's version of events whereby Roe kissed him without his consent was never debunked, LIU inexplicably managed to find Roe's bald allegations that Doe committed Code of Conduct and SVHP violations against her credible while finding Doe's allegation that Roe committed similar violations against him not credible. Doe, who was supposed to be presumed innocent until proven otherwise per LIU policy and applicable State and Federal law, was penalized for the allegations by Roe while Roe was not penalized for the allegations by Doe.

102.    Defendants thus exhibited a pattern or practice of racial bias against Doe during their investigation of the events surrounding Roe's fabricated Complaint by the differential treatment he and his White accuser received in that, amongst other things, it was never disproven that Roe was the aggressor who initiated sexual contact with Doe without his affirmative consent and, in doing so, she acted willfully and with force.

103.    Defendants exhibited a pattern or practice of racial bias against Doe during their investigation of the events surrounding Roe's fabricated Complaint by the differential treatment he and his White accuser received in that, amongst other things, Defendants could not attribute a negative motivate to Roe, despite witness testimony establishing that her initial primary concern had been the negative impact her kiss with Doe might have on a relationship she was in with another man at the time, but Defendants determined that, by sheer virtue of being accused, Doe could not be presumed innocent and instead was presumed manipulative and not credible.

104.   Similarly, Defendants exhibited intentional and substantial racial bias when they did not impose sanctions similar in nature or degree to those they had given Doe upon Doe's similarly situated White teammate who had been accused of physically assaulting his girlfriend in violation of LIU's Code of Conduct and SVHP the same week that Roe filed her Complaint against Doe.

105.   As indicated by Defendants' disparate and negative treatment of African-American students accused of Code of Conduct and SVHP violations compared to Defendants' treatment of similarly-situated Caucasian students, LIU is on alert and willing to bring a disciplinary action on behalf of a white student against an African-American student, but not willing to bring a disciplinary action on behalf of an African-American student against a Caucasian student even if the African-American student alleges Policy violations similar to the allegations asserted by the Caucasian student.

106.   An intentional and motivating factor for the manner in which Defendants chose to proceed with the Title IX investigation was Doe's race.

107.   As a result of Defendants' unjust and biased Title IX investigation, Doe was adversely treated and was caused detrimental interference delay in his education.

108.   Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

109.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest,

attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
**Violation of the New York State Constitution (Art. I, § 6, Due Process)**

110.   Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

111.   Pursuant to the New York State Constitution, Doe cannot be deprived of life, liberty or property without due process of law.

112.   By virtue of Art. 129, through which New York State has significantly involved itself and become a meaningful participant in otherwise private conduct, Defendant LIU and its agents and employees, including the named defendants, are state actors.

113.   As a direct result of Defendants' actions, which they undertook under the color of state law, Doe has suffered a loss of his protected liberty interest in his good name, reputation, honor, and integrity, coupled with the loss of his good standing as a student at LIU.

114.   By mandate of New York State law, Doe's transcript now reflects that he was suspended for a sexual misconduct code violation.

115.   As set forth in detail above, Defendants deprived Doe of his liberty interests, and caused him resulting reputational and tangible harm, without due process of law.

116.   Defendants failed to adequately notify Doe of the charges against him, and failed to provide Doe a fair hearing.

117.   As a direct and proximate result of Defendants' conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

118.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of Contract

119.    Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

120.    At all times relevant hereto, a contractual relationship existed between LIU and Doe through LIU's policies and procedures governing the student disciplinary system, including but not limited to the Code of Conduct.

121.    Through the documents it publishes and provides to students, Defendant LIU makes express contractual commitments to students involved in a disciplinary process.

122.    Based on the foregoing, LIU created express and implied contracts with Doe.

123.    The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

124.    Based on the aforementioned facts and circumstances, Defendant LIU breached its agreement(s) with John Doe and the implied covenant of good faith and fair dealing therein.

125.    Defendant LIU committed several breaches of its agreements with Doe during the investigation and hearing process, including, without limitation:

        a)      discriminating against Doe on the basis of his gender, as set forth above, in violation of the SVHP and broader Code of Conduct, which breach caused the aforementioned harm to Doe;

        b)      failing to adhere to the "preponderance of evidence" standard, as set forth in the SVHP, which breach caused the aforementioned harm to Doe.

126.    Based on the aforementioned facts and circumstances, Defendant LIU breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Doe.

127.    As a direct and foreseeable consequence of the foregoing breaches, Doe sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

128.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**<u>Breach of Contract/Common Law:</u>**
**<u>Denial of Basic Fairness/Arbitrary and Capricious Decision Making</u>**

129.    Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

130.    Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Doe were conducted in good faith and with basic fairness.

131.    Defendants breached this duty of good faith and basic fairness by, without limitation:

- Failing to provide specific notice to Doe of the allegations against him, thereby depriving him of an opportunity to test those allegations and counter them during the proceedings, particularly as the allegations changed over time;

- Failing to provide Doe notice of his right to choose an advisor in connection with the Title IX investigation;

- Failing to provide Doe notice of his right to present evidence and witnesses on his behalf during the investigation;

- Failing to provide Doe notice of his right to make an impact statement at the sanctions phase of the investigation;

- Failing to provide Doe notice when the Title IX investigation had reached a point where sanctions were being deliberated;

- Failing to provide Doe any notice of their decision to permanently terminate his participation in LIU's football and track programs, and his attendant full scholarship;

- Employing a method of investigation and adjudication intended to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

- Failing to provide Doe the opportunity to be heard in front of a fair and impartial tribunal;

- Failing to provide Doe the opportunity to confront and cross-examine witnesses at a fair hearing.

132.    Defendants' breach of the duty to ensure basic fairness proximately caused Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

133.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Promissory Estoppel

134.    Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

135.    Defendant LIU's policies constitute unambiguous representations and promises that LIU should have reasonably expected to induce action or forbearance on the part of John Doe.

136.    Defendant LIU expected or should have expected Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives on the full scholarship he had been given by LIU, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Campus Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

137.    Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Defendant LIU, by choosing to attend LIU rather than other schools of equal caliber, and even choosing to reapply to LIU after he suspension under the impression he could rejoin his athletic teams and continue on with his scholarships.

138.    These express and implied promises and representations made by LIU must be enforced to prevent substantial injustice to Doe.

139.    Based on the foregoing, Defendant LIU is liable to Doe based on promissory estoppel.

140.    As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

141.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Doe demands Judgment against the Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a declaratory judgment per 28 U.S.C. § 2201 that Defendants violated Title IX by erroneously finding John Doe responsible for sexual misconduct in violation of Defendant's policies and unjustly severely sanctioning him with a one-year suspension, and the permanent revocation of his full scholarship and membership on LIU's football and track teams, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and further awarding a permanent injunction as stated in subparagraph (vii) below;

(ii)    on the second cause of action for violation of Title VI of the Civil Rights Act of 1964, a declaratory judgment per 28 U.S.C. § 2201 that Defendants violated Title VI by erroneously finding John Doe responsible for sexual misconduct in violation of Defendant LIU's policies and unjustly severely sanctioning him with a one-year suspension, and the permanent revocation of his full scholarship and membership on LIU's football and track teams, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and further awarding a permanent injunction as stated in subparagraph (vii) below;

(iii)     on the third cause of action for a violation of the New York State Constitution, a declaratory judgment per 28 U.S.C. § 2201 that Defendants violated Art. I, § 8 of the New York State Constitution by denial of procedural due process, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and a judgment awarding a permanent injunction as stated in subparagraph (vi) below;

(iv)     on the fourth cause of action for breach of contract, a declaratory judgment per 28 U.S.C. § 2201 that Defendants breached a contract with Doe, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)     on the fifth cause of action for denial of basic fairness under contract and common law, a judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for promissory estoppel, a declaratory judgment per 28 U.S.C. § 2201 that Defendants are subject to promissory estoppel, a monetary judgment awarding Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational opportunities, and loss of future career prospects;

(vii)   a permanent injunction that: (i) the outcome and findings made against Doe by Defendant LIU be vacated; (ii) Doe's disciplinary record be expunged of all references to the disciplinary case; (iii) all records related to Doe's suspension and probation from LIU be removed from his education file; (iv) any record of the complaints filed against Doe be permanently destroyed; and (v) LIU's policy applicable at the time of Doe's case is unconstitutional as applied; and

(viii)   awarding Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff Doe herein demands a trial by jury of all triable issues in the present matter.


Dated:      New York, New York
            September 11, 2020


                              **AIDALA, BERTUNA & KAMINS, P.C.**
                              *Attorneys for Plaintiff*

                              By: /s/ Imran H. Ansari_____
                              Imran H. Ansari, Esq.
                              546 5th Avenue, Sixth Floor
                              New York, New York, 10036
                              (212) 486-0011
                              iansari@aidalalaw.com